UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

MICHAEL SAPIA, *et al.*,

        Plaintiffs,

    -against-

HOME BOX OFFICE, INC.,

        Defendant.

------------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12/17/18

No. 18 Civ. 1317 (CM)

## DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

McMahon, C.J.:

Plaintiffs bring this action against Defendant Home Box Office, Inc. ("HBO"), claiming unlawful retaliation, in violation of Fair Labor Standards Act ("FLSA) and New York Labor Law ("N.Y. Lab. Law"), by virtue of their participation in an earlier lawsuit accusing HBO of failing to pay overtime wages to which Plaintiffs were entitled.

HBO now moves to dismiss the First Amended Complaint, the operative complaint in this action, for failure to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6).

For the reasons that follow, Defendant's motion is GRANTED.

### I.    Factual Background

The following facts are drawn from the First Amended Complaint and from documents incorporated therein that the Court may properly consider.[1]  For purposes of this motion, the

---

[1] On a motion to dismiss, the Court may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, or those that are "integral" to the complaint. *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016)

Court accepts those facts (although not Plaintiffs' legal conclusions) as true, and construes them in the light most favorable to Plaintiffs. *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009).

   a.   Overview of Parties

HBO owns and operates a premium pay television network, whose business consists of, among other things, producing films and television series. (First Amended Compliant ("Am. Compl.") ¶15, Dkt. No. 17.)

Plaintiffs are 42 Parking Production Assistants ("PPAs"). PPAs are primarily responsible for arriving at locations that are to be used for the filming of movies and television shows and using their personal vehicles to reserve parking spots for production vehicles. (Am. Compl. ¶¶ 2, 17.) The nature of PPAs' work is that it is only available during the days in which a production is "on location," which often lasts for short periods. (*Id.* ¶ 18.) Despite the limited duration of their work, PPAs are typically called back to productions to work on movie sequels or subsequent seasons of a television series. (*Id.*) Thus, as a practical matter, PPAs "continually rotat[e] from one production to the next, [] tend to be employed by multiple productions," and usually "work for multiple employers over the course of any given period of time." (*Id.*)

PPAs are employed directly by production companies, which are entities that are created, financed, or otherwise supported by studios in order to develop their television programs or motion pictures. (*Id.* ¶¶ 21–24.) Production companies, in turn, employ parking coordinators ("Parking Coordinators"), whose primary responsibilities are to hire and assign jobs to PPAs, either directly or by liaising with PPA supervisors ("PPA Supervisors") to assign the work. (*Id.* ¶¶ 17, 29, 62.)

   b.   Working Relationship Between Parties

As alleged in the First Amended Complaint, HBO produced its movie and television projects by using either its own subsidiaries or third-party affiliate production companies to coordinate filming. (*Id.* ¶¶ 23–25.) Defendant and its production companies list the same address on their corporate records and jointly issued Plaintiffs' paychecks from the same address. (*Id.* ¶¶ 30–31.) Defendant provided payroll companies with all of the necessary hiring and employment records associated with paying PPAs, including W-2 employment forms, W-4 employment forms, pay rate acknowledgment forms, wage verification forms, direct deposit forms, and employment verification forms. (*Id.* ¶ 33.) In negotiating labor relations with a union that represents PPAs, including Plaintiffs, Defendant allegedly held itself out as Plaintiffs' employer. (*Id.* ¶¶ 47–48.)

HBO did not have a formal hiring process for filling vacant PPA positions. (*Id.* ¶ 55.) Instead, Defendant delegated the responsibility for hiring PPAs to Parking Coordinators, who hired PPAs by either contacting them by telephone or sending a text message. (*Id.* ¶¶ 58, 61.) Parking Coordinators enjoyed considerable latitude in deciding who to hire, retain, and deploy on particular HBO production assignments. (*Id.* ¶¶ 59–60.) It was often the case, however, that the same PPAs who worked previous HBO assignments were invited back to work subsequent assignments for the company. (*Id.* ¶¶ 66–68.)

While working as PPAs on Defendant's sets, Plaintiffs were required to wear identification badges with HBO's logo, and were given other HBO paraphernalia upon the completion of each project. (*Id.* ¶¶ 27–28.)

c.   Prior Dispute Between Parties and Other Production Studios

In 2015, a group of PPAs brought a series of twelve lawsuits in this District against "virtually all of the major film and television networks who utilize PPAs in connection with

productions set in the New York metropolitan area," asserting that the companies failed to pay overtime wages to which the PPAs were entitled (collectively, the "PPA Lawsuits"). (*Id.* ¶ 3.) Defendant was named in one of these lawsuits along with other production companies that worked on HBO projects. *See Fermin, et al. v. Home Box Office, Inc., et al.*, 15 Civ. 7941 (AT)(JCF) (S.D.N.Y. 2015) (hereinafter referred to as "*Fermin*" or the "*Fermin* Lawsuit").

The parties in *Fermin* ultimately reached a settlement agreement (hereinafter referred to as the "Settlement Agreement"). (Am. Compl. ¶¶ 50–51.) Prior to settlement, HBO was voluntarily dismissed from that case. (*Id.* ¶ 51.) Despite its dismissal, HBO participated in settlement negotiations and served as the sole signatory to the Settlement Agreement on behalf of the production companies purportedly under its control. (*Id.*) The Settlement Agreement in *Fermin* contains two release provisions, which provide for the release of all claims under FLSA and New York state law, respectively, that "accrued or accrue up through October 1, 2016." (Zuckerman Decl. Ex. C ¶¶ 1.33–34.)

The First Amended Complaint asserts that, in addition to participating in the *Fermin* Lawsuit, all Plaintiffs in this action participated in various other PPA Lawsuits as well. (Am. Compl. ¶ 79 (citing *Hines, et al. v. CBS Corporation et al.*, 15 Civ. 07882 (PGG) (S.D.N.Y. 2015); *Leach, et al. v. Warner Brothers Inc., et al.*, 15 Civ. 7208 (AT)(JCF) (S.D.N.Y 2015); & *Morgan, et al. v. Warner Bros. Pictures, a division of WB Studio Enterprises Inc., et al.*, 16 Civ. 1411 (JCF) (S.D.N.Y 2016)).

d. Alleged Retaliation

Plaintiff asserts that HBO engaged in an "inquisition" into which PPAs participated in the PPA Lawsuits. (*Id.* ¶ 82.) HBO allegedly compiled a list of all the lawsuit participants, using "various sources" of information to ascertain the identity of the plaintiffs. (*Id.* ¶ 84–86.) It then

4

directed Parking Coordinators to question Plaintiffs about their involvement. (*Id.* ¶ 84.) Upon learning which PPAs participated, the Parking Coordinators – purportedly acting at the direction of Defendants – reduced the number of shifts to which PPAs were assigned and, in some circumstances, refused to assign certain PPAs any work altogether, despite their being a need for PPAs to staff local HBO productions. (*Id.* ¶¶ 87–88, 92.)

In support of these allegations, the First Amended Complaint identifies one Parking Coordinator by name, an individual named Maurice Cabrera, whose LinkedIn page identifies him as being a Parking Coordinator for a number of "major production companies," including HBO. (*Id.* ¶¶ 29, 94; *see also* Declaration of Lyle S. Zuckerman ("Zuckerman Decl.") Ex. A, Dkt. No. 22.) On August 9, 2017, Mr. Cabrera filed a lawsuit before this Court, styled as *Cabrera, et al. v. CBS Corporation, et al.*, 17 Civ. 6011 (CM) (S.D.N.Y. 2017), alleging that he and two other PPA Supervisors were wrongfully terminated by CBS Corporation and CBS Television Studios for their reluctance to terminate PPAs who participated in *Hines, et al. v. CBS Corporation et al.*, 15 Civ. 07882 (PGG) (S.D.N.Y. 2015), one of the PPA lawsuits that was filed in 2015. (Am. Compl. ¶ 94.) The plaintiffs in *Cabrera* assert that CBS Corporation implemented a policy and practice of denying work to PPAs who participated in *Hines*. (Am. Compl. ¶ 94.)

Plaintiffs assert that HBO implemented the same policy with respect to PPAs' participation in *Fermin*. (*Id.*) According to Plaintiffs, this policy manifested itself in one of four ways.

*First*, Mr. Cabrera allegedly met with some of the Plaintiffs, told them that *Fermin* and the other PPA Lawsuits were "getting out of hand," and directed them to remove themselves from all lawsuits or risk receiving fewer shifts. (*Id.* ¶¶ 102–05, 120–121, 131–32, 142, 319.) He

then instructed some Plaintiffs to sign a "Working Agreement," which required them to promise to stop discussing or participating in any PPA Lawsuits. (*Id.* ¶¶ 106–08, 122–23.) When those Plaintiffs refused to sign the Working Agreement, they were no longer assigned to any PPA shifts, despite making numerous requests for additional PPA work. (*Id.* ¶¶ 109–11, 124–25, 133–34, 144–45.)

*Second*, the First Amendment Complaint alleges that certain Plaintiffs suffered the same type of retaliation from their PPA Supervisors, who delivered substantially the same message as Mr. Cabrera: namely, cease participating in *Fermin* and the other PPA Lawsuits, or suffer the consequences. (*Id.* ¶¶ 152–55, 166–66,173–76, 217–220, 342–47.)

*Third*, a sub-set of Plaintiffs allege that they inexplicably lost PPA assignments for HBO projects after they participated in an interview with the New York Times, in which they gave an on-the-record account of the purported wage-and-hour violations that that were supposedly widespread in the PPA industry and were the subject of the PPA Lawsuits. (*Id.* ¶¶ 183–88, 195–99.)

*Fourth*, the remaining Plaintiffs – those who were not warned by their supervisors, and those who had not gone public with their objections to the industry's purported underpayment of PPAs – allege that their PPA shifts with HBO were reduced or eliminated for no apparent reason other than that they simply had participated in the *Fermin* Lawsuit and other PPA Lawsuits. (*Id.* ¶¶ 204–10, 225–29, 235–37, 242–47, 252–55, 262–64, 269–74, 280–83, 288–91, 297–300, 306–09, 314–18, 324–27, 332–36, 352–55, 362–66, 371–75, 380–84, 389–393, 398–402, 407–11, 416–20, 425–30, 435–39, 444–46, 454–57, 462–66, 471–75, 480–84, 489–93, 498–501.) These individuals do not allege that they were warned about participating in those lawsuits and what it would mean for their employment prospects with HBO. (*Id.*)

Because it is common practice in the production industry for production companies to employ the same Parking Coordinators, Plaintiffs allege that their being underutilized or passed over for HBO assignments has resulted in their being frozen out of the entire industry. (*Id.* ¶ 93.)

## II.    Discussion

Plaintiffs filed the present action against HBO on February 14, 2018, claiming that HBO's alleged policy of assigning fewer or no work shifts to Plaintiffs following their participation in *Fermin* and the other PPA Lawsuits violated the anti-retaliation provisions of FLSA, pursuant to 29 U.S.C. § 215(a)(3) (Count I), and N.Y. Lab. Law § 215 (Count II).[2] They are seeking, *inter alia*, compensatory damages, a judgment declaring that HBO's retaliatory practices violate FLSA and N.Y. Lab. Law, and preliminary and permanent injunctions against future retaliation.

HBO has moved to dismiss the First Amended Complaint under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.

Because the FLSA and N.Y. Lab. Law retaliation provisions are "nearly identical," the sufficiency of the pleadings in the First Amended Complaint is assessed under the same legal framework. *See Lopez v. Advantage Plumbing & Mech. Corp*, No. 15-CV-4507 (AJN), 2016 WL 1268274, at *1 (S.D.N.Y. Mar. 31, 2016); *Torres v. Gristede's Operating Corp.*, 628 F. Supp. 2d 447, 471 n.18 (S.D.N.Y. 2008).

---

[2] Plaintiffs do not cite the applicable provisions of FLSA and N.Y. Lab. Law under which they are bringing suit. The First Amended Complaint purports to bring claims under 29 U.S.C. §§ 201 *et seq.*, which is the entire chapter in the United States Code devoted to FLSA. And it does not provide any statutory citation altogether for Plaintiffs' claims under N.Y. Lab. Law. Despite this serious deficiency, the Court declines to dismiss the First Amended Complaint on this basis, since the pleadings have succeeded in giving Defendant fair notice of the claims being brought against it. *See* Fed. R. Civ. P. 8(a); *see also Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117, 121 (2d Cir. 2007).

a. <u>HBO's Motion to Dismiss the Amended Complaint is Granted</u>

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (alteration, citations, and internal quotation marks omitted).

A complaint for retaliation under FLSA must allege facts demonstrating: "(1) participation in protected activity known to the defendant, like the filing of a FLSA lawsuit; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." *Kassman v. KPMG LLP*, 925 F. Supp. 2d 453, 472 (S.D.N.Y. 2013) (quoting *Mullins v. City of New York*, 626 F.3d 47, 53 (2d Cir. 2010)) (internal quotation marks omitted). At the pleading stage, a plaintiff is not required to allege specific evidence as to each *prima facie* element, but rather must plead facts sufficient to render his claim plausible. *Bowen v. Baldwin Union Free Sch. Dist.,* 2017 WL 4083553, at *7 (E.D.N.Y. Aug. 23, 2017); *Wang v. Palmisano,* 157 F. Supp. 3d 306, 328-29 (S.D.N.Y. 2016). These elements, however, "provide an outline of what is necessary to render a plaintiff's claim for relief plausible." *Id.* (internal alterations and quotation omitted).

HBO does not dispute that the first element of retaliation – engagement in a "protected activity," such as the filing of a lawsuit under FLSA – is readily established.  It does, however, dispute the latter two elements.  Each will be taken in turn.

1.  *Whether Plaintiffs Adequately Pleaded the Existence of an Employment Relationship Between Them and HBO*

HBO avers that the First Amended Complaint inadequately pleads factual matter from which the Court may infer the existence of an employment relationship between HBO and Plaintiffs.

This argument is unavailing.

To be liable under FLSA and N.Y. Lab. Law, HBO must be an "employer."  *See Herman v. RSR Sec. Serv. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999).  An employer under either statute is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee...." 29 U.S.C, § 203(d); *see also Spicer v. Pier Sixty LLC*, 269 F.R.D. 321, 335 n.13 (S.D.N.Y. 2010) (definitions of "employer" under N.Y. Lab. Law and FLSA are coextensive), *accord Inclan v. N.Y. Hosp. Grp., Inc.*, 95 F. Supp. 3d 490, 511 (S.D.N.Y. 2015).  An individual may have more than one employer for purposes of FLSA, in which case, "all joint employers are responsible, both individually and jointly, for compliance with all applicable provisions of [FLSA]." 29 C.F.R. § 791.2(a).

The Supreme Court has emphasized the "striking breadth" of FLSA's definition of employee. *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992); *see also Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729 (1947).  In light of this broad definition, the Second Circuit regards employment status under FLSA as a "flexible concept." *Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 141 (2d Cir. 2008).  Courts should ground employment determinations in "'economic reality rather than technical concepts,' determined by reference not

to 'isolated factors, but rather upon the circumstances of the whole activity.'" *Id.* at 141 (quoting *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961), and *Rutherford*, 331 U.S. at 730).

Under the economic reality test, courts consider "'whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.'" *Herman*, 172 F.3d at 139 (quoting *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984)). The heart of the matter is the extent to which the alleged employer possesses control over the workers in question. *Herman*, 172 F.3d at 135; *see also Lopez v. Acme Am. Envtl. Co., Inc.*, No. 12 Civ. 511 (WHP), 2012 WL 6062501, at *3 (S.D.N.Y. Dec. 6, 2012). Two additional considerations bear on this inquiry.

The first is the scope of an entity's "operational control" over "employment-related factors such as workplace conditions and operations, personnel, or compensation." *Irizarry v. Catsimatidis*, 722 F.3d 99, 106, 109 (2d Cir. 2013). "In assessing this factor, the Second Circuit has placed emphasis on the extent to which the individual (1) 'exercised financial control over the company,' and (2) gave instructions to subordinate managers on matters concerning employment practices." *Vasto*, 2016 WL 4147241, at *4 (quoting *Irizarry*, 722 F.3d at 116). The second consideration is the entity's "potential power" to control employees, even if not exercised. *Irizarry*, 722 F.3d at 110. Though control may be exercised only occasionally, "such limitations on control do not diminish the significance of its existence." *Herman*, 172 F.3d at 139 (quotation marks and internal citations omitted).

Applying these various considerations to the matter at hand, Plaintiffs have adequately pleaded an employment relationship with HBO, because they have alleged various facts that,

taken together, give rise to an inference of both actual and potential control over Plaintiffs' employment affairs. Specifically, the First Amended Complaint asserts that HBO (*i*) possessed the power to hire and fire PPAs and instructed Parking Coordinators to assign fewer shifts to certain individuals (indeed, that is the crux of the entire lawsuit); (*ii*) determined the pay rate and method of payment for PPAs; (*iii*) provided payroll companies with all of the necessary hiring and employment records for Plaintiffs; (*iv*) held itself out as Plaintiffs' employer on employment records, in labor negotiations, and in other legal proceedings; and (*v*) provided the financing necessary to ensure that its production companies, Plaintiffs' direct employers, were able to create its film and television productions. These facts, each one standing alone as an indicium of control, taken together constitutes a powerful inference that an employment relationship existed between Defendant and Plaintiffs under FLSA and N.Y. Lab. Law.

HBO argues that the Amended Complaint insufficiently pleads employment status, since it does not identify the particular the production companies that employed Plaintiffs and Plaintiffs' dates of employment at those companies. (Def.'s Mem. of Law in Supp. Mot. to Dismiss ("Def.'s Br.") at 14, Dkt. No. 21 (citing *Dejesus v. HF Mngmt Svcs. LLC*, 726 F.3d 85, 91 (2d Cir. 2013).) This argument mistakes a sufficient for a necessary condition – a distinction that *Dejesus* expressly contemplates. *See Dejesus*, 726 F.3d at 91 ("In the context of a motion to dismiss, district courts in this Circuit have [] found that complaints *sufficiently allege* employment when they state where the plaintiffs worked, outline their positions, and provide their dates of employment.") (emphasis added).

Accordingly, Plaintiffs have pleaded sufficient factual matter from which the Court may infer the existence of an employment relationship between the parties, especially in light of the breadth of the employment doctrine under FLSA and N.Y. Lab. Law.

2. *Whether Plaintiffs Adequately Pleaded a Causal Connection Between the Protected Activity and the Adverse Employment Action*

Next, HBO argues that Plaintiffs have inadequately pleaded a causal connection between the protected activity – here, participating in *Fermin* – and the adverse employment action of seeing their PPA shifts reduced or eliminated.

To satisfy the third element of a retaliation claim, a plaintiff may establish a causal connection between an adverse employment action and protected activity "'through evidence of retaliatory animus directed against a plaintiff by the defendant,' or 'by showing that the protected activity was closely followed in time by the adverse action.'" *Mullins*, 626 F.3d at 53 (citations and quotations omitted). "While the Second Circuit has articulated no 'bright line' rule for when an alleged retaliatory action occurs too far in time from the exercise of a federal right to be considered causally connected, it is well settled that when 'mere temporal proximity' is offered to demonstrate causation, the protected activity and the adverse action must occur 'very close' together.'" *Galimore v. City Univ. of N.Y. Bronx Comm. Coll.*, 641 F.Supp.2d 269, 288 (S.D.N.Y. 2009). Some courts have found that two to three months was too long, *Beachum v. AWISCO N.Y.*, 785 F. Supp. 2d 84, 98–99 (S.D.N.Y. 2011), while others have found that an adverse action as much as eight months after an employee's protected activity, paired with other evidence, could raise an inference of retaliatory motive. *Salazar v. Bowne Realty Associates, L.L.C.*, 796 F. Supp. 2d 378, 384–85 (E.D.N.Y. 2011).

HBO contends that Plaintiffs have pleaded the third element of their anti-retaliation claims with insufficient particularity, because they did not specify on which dates they applied and were denied work for HBO-related projects. This failing has two implications.

*First*, under these circumstances, HBO writes, it is impossible to attribute the alleged retaliation to HBO – as opposed to the various other companies for whom the Parking

Coordinators and Parking Supervisors executing the purported retaliation scheme worked – since the PPA Lawsuits targeted the entire industry, and the nature of the industry is such that PPAs frequently work on various productions and for various production companies (and sometimes during the same overlapping periods).

*Second*, HBO argues that it is impossible to ascertain whether some or all of Plaintiffs have released the claims they purport to assert by virtue of their participation in *Fermin* and the Settlement Agreement that was executed in that case.

Defendant's first argument rises and falls on the applicable motion to dismiss standard, the meaning of "plausibility pleading," and the extent to which the Court is permitted to draw inferences in Plaintiffs' favor. HBO's argument, in essence, boils down to an argument that the pleadings contemplate that it is just as likely, if not more so, that Plaintiffs were retaliated against by other companies in the industry, and that the Parking Coordinators and Parking Supervisors who were tasked with executing the alleged retaliation campaign were acting on those other companies' behalves. This is especially so given the breadth of the PPA Lawsuits, the nature of the industry – everyone works for everyone – and in light of the allegations in *Cabrera*, in which Mr. Cabrera – a man who wears many hats, according to the First Amended Complaint and Mr. Cabrera's own LinkedIn Page – claims CBS implemented the very retaliation campaign alleged here.

The Court, however, does not weigh competing inferences at the motion to dismiss stage. It draws all reasonable inferences in Plaintiffs' favor. Doing just that, the Court may infer that HBO retaliated against Plaintiffs in response to their participating in *Fermin*. For illustration, the Court breaks down the allegations in the pleadings into a simple enthymematic sequence:

**Premise:** Defendant compiled a list of all PPAs involved in *Fermin* and the other PPA Lawsuits by collecting names from Parking Coordinators, PPA Supervisors, and those names that were publicly available on ECF.

**Premise:** Parking Coordinators and Parking Supervisors confronted some of Plaintiffs, interrogated them about their participation in those lawsuits – *Fermin* included – and challenged them to withdraw their names.

**Premise:** Plaintiffs expressly asked for and were denied PPA work.

**Conclusion:** Defendant retaliated against Plaintiffs.

At this stage, the Court may draw the conclusion of retaliatory animus from these three premises, all of which are presumed to be true and construed in a light most favorable to Plaintiffs for present purposes. The Court need not – indeed, may not – test whether that conclusion is correct at this stage of the proceedings.

Defendant's second argument, however, is fatal to Plaintiffs.

As noted, the Settlement Agreement, which is both incorporated by reference and integral to the First Amended Complaint, contains two provisions that provide for the release of all claims under FLSA and New York state law that "accrued or accrue up through October 1, 2016." (Zuckerman Decl. Ex. C ¶¶ 1.33–34.) It is undisputed that Plaintiffs were all parties to *Fermin*, and, therefore, to the Settlement Agreement. (*See* Pls.' Mem. of Law in Opp. Mot. to Dismiss ("Pls.' Opp.") at 24, Dkt. No. 25 (citing numerous paragraphs from First Amended Complaint).)

Thus, to avoid the preclusive effect of what is, by all accounts, a valid and enforceable settlement agreement (which, as relevant here, was approved by Magistrate Judge James C. Francis IV by order dated September 1, 2017, (*see* 15 Civ. 7941, Dkt. No. 181),[3] it was incumbent on Plaintiffs to plead facts from which a reasonable trier of fact could conclude that HBO engaged in retaliatory conduct *after the period covered by the release.*

---

[3] The Court may take judicial notice of this order, which is referenced on a public docket, pursuant to Fed. R. Evid. 201(b)(2). *See also Rothman v. Gregor,* 220 F.3d 81s, 91–2 (2d. Cir. 2000).

Plaintiffs failed to do so here.

In fact, the face of the First Amended Complaint overwhelmingly supports the opposite conclusion: that the alleged retaliation took place "during the pendency of [*Fermin*]" (Am. Compl. ¶ 81), and that, therefore, all but one of Plaintiffs is barred by the releases contained in the Settlement Agreement from bringing this action. A review of the pleadings reveal that virtually all pertinent dates in the pleadings occurred prior to October 1, 2016.

Take, for example, the first three Plaintiffs identified in the First Amended Complaint. Plaintiff Michael Sapia opted into *Fermin* on February 10, 2016 (*id.* ¶ 99), was confronted by Mr. Cabrera "in or around April 2016" (*id.* ¶ 102), and was "subsequently" retaliated against. (*Id.* ¶ 109.) Plaintiff Christian Pellot filed *Fermin* on October 8, 2015, and that "[a]fter Defendant learned that Plaintiff C. Pellot commenced [*Fermin*], Defendant ceased assigning him shifts of work and he was terminated." (*Id.* ¶¶ 117, 119.) Plaintiff Neftali Pellot opted into *Fermin* on November 11, 2015, after which Mr. Cabrera telephoned him, stating, "I can't give you no more work." (*Id.* ¶ 130, 132.) Indeed, according to Plaintiffs, "*each* Plaintiff" was retaliated against "shortly thereafter" he or she filed or opted into *Fermin*. (Pls.' Opp. at 10 (emphasis in original).) Plaintiffs' failure to specify the exact timeframe leaves the Court with no favorable inferences to draw, as the Court is not permitted to presume facts not pleaded.

Of the 42 Plaintiffs, it is alleged with respect to only one individual that the alleged retaliation occurred after October 1, 2016. The First Amended Complaint asserts that "[o]n or around October 4, 2016," Plaintiff Curtis Neil opted into *Fermin*, and that "[s]hortly after opting into the Lawsuit, Defendant ceased assigning Plaintiff Neil any shifts to work." (Am. Compl. ¶¶ 416–18.) These allegations suffice to state a claim with respect to that individual. They do not, however, rescue Plaintiffs' deficient pleadings with respect to the other 41 individuals.

The failure to plead exact dates when Plaintiffs suffered retaliation is particularly glaring given that, as pleaded in the First Amended Complaint, this information is uniquely in Plaintiffs' possession and contained on their cellphones. (Am. Compl. ¶¶ 58, 61.) As the Second Circuit has instructed, "[I]mprecise pleading is particularly inappropriate . . . where the plaintiffs necessarily have access, without discovery, to . . . specific information from which to fashion a suitable complaint." *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 723 (2d Cir. 2013).

What explains Plaintiffs' deficient pleadings? It appears that Plaintiffs have made a fundamental mistake. In their opposition papers, Plaintiffs write that "[a] mere glance at [*Fermin*'s] settlement agreement reveals that it only releases Plaintiffs' FLSA and [N.Y. Lab. Law] claims up until October 1, 2016 – approximately seven (7) days before [*Fermin*] commenced." (Pls.' Opp. at 23.) Plaintiffs apparently are confused about when *Fermin* was filed. *Fermin* was filed on October 8, 2015, not 2016. This mistake is telling. Apparently, Plaintiffs are operating under the belief that, because *Fermin* was filed after the date specified as the release point in the Settlement Agreement, all of the retaliation alleged to have occurred in the First Amended Complaint is not disclaimed by that agreement. This confusion perhaps explains why Plaintiffs failed to plead with precision the particular dates against which they were retaliated, because they assumed – and, more important, believed the Court could readily infer – that all retaliation encompassed within the First Amended Complaint necessarily occurred outside the window provided for in the Settlement Agreement and thus was actionable. It also highlights why Plaintiffs' pleading are so deficient.

**CONCLUSION**

Based on the foregoing, Defendant's motion to dismiss is GRANTED IN PART AND DENIED IN PART without prejudice to Plaintiffs' refiling a new complaint that plausibly pleads that the alleged retaliation suffered by all Plaintiffs occurred after the period covered by the Settlement Agreement.  Plaintiff Curtis Neil has stated a valid cause of action.

The Clerk of Court is respectfully directed to terminate Dkt. No. 20.

Dated: December 17, 2018

_____
Chief Judge

TO ALL PARTIES BY ECF